UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER L. PETERSON,

          Plaintiff,

                                        Case No. 05-CV-74862

vs.

                                        HON. GEORGE CARAM STEEH

GENERAL MOTORS CORP.,

          Defendant.
_____/

ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 50]

This case arises out of plaintiff Christopher Peterson's complaint against his employer, defendant General Motors Corporation ("GM"), alleging violations of ERISA, 29 U.S.C. 1140; the Family and Medical Leave Act, 29 USC 2101; retaliation under Michigan's Elliott Larsen Civil Rights Act; and the Persons with Disabilities Civil Rights Act. Plaintiff's claims fail for the reasons stated below, and defendant's motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

Plaintiff began his employment with GM in the 1970s, as an Associate Statistician for Oldsmobile Division, Lansing, Michigan. Plaintiff's service date is August 19, 1974. (Defendant's Ex. A) Plaintiff received many promotions over the years. In January 1999, plaintiff was employed as Executive Sales by North American Vehicles Sales, Service & Marketing ("VSSM") in the Southeast Region of the United States, located in Atlanta. In this position, plaintiff reported to William Powell, General Director

of the Southeast Region. Plaintiff's job performance in 1999-2000 was above standard and his compensation was substantial.

GM maintains an employment policy that requires any supervisor who becomes romantically involved with a subordinate to advise GM management of the relationship. The purpose of the policy is to avoid impropriety by having a supervisor improperly influenced when supervising a subordinate. (Peterson dep. pp. 27-29)

In March/April 2000, rumors of a romantic relationship between plaintiff and one of his subordinates, Julie Shaeffer, reached the VSSM Central Office in Detroit. William Powell met with plaintiff and asked him if he was having a relationship with a subordinate. Plaintiff denied that any such relationship existed. (Powell dep. pp. 58-59) In October/November 2000, plaintiff's wife called Mr. Powell's wife and advised her that the Peterson's marriage was ending, and that plaintiff had been having an affair with Julie Shaeffer. Mr. Powell confronted plaintiff, who admitted to the relationship with Shaeffer. Plaintiff ultimately married Schaeffer. In the Fall of 2001, Julie Schaeffer told Deborah Eastern-Hall, a VSSM Human Resource representative, that she was involved in a relationship with plaintiff. (Eastern-Hall dep., pp. 24-26)

Julie Shaeffer's history at GM, included her allegations of an act of sexual harassment by another member of the VSSM Southeast Region staff. The event in question occurred in March 1997, long before plaintiff met Shaeffer in January 1999, while they were both assigned to GM's Atlanta Regional Office. In July 2001, plaintiff took up Shaeffer's complaint that a hostile work environment was created for her since no one at GM had done anything about her complaints of sexual harassment. Plaintiff contends that he was later retaliated against for his efforts on behalf of his future wife.

2

On October 1, 2000, plaintiff was transferred to LAAM (Latin America, Africa and Middle East) Headquarters in Miami, Florida. The promotion moved plaintiff to an LTI [Long Term Incentive] position. The promotion made plaintiff a formal GM Executive entitled to bonuses and other perquisites, and came with a 12.57% salary increase. There was talk of a potential future transfer to an Executive Position in Brazil at this time. Mr. Powell took no disciplinary actions against plaintiff because the reporting relationship between plaintiff and Julie Schaeffer ended at the time of his promotion. Powell did advise VSSM personnel of the relationship between plaintiff and Schaeffer. (Powell dep. pp. 20-24)

Plaintiff worked in Miami for LAAM from October 1, 2000 to May 1, 2002. At that time it was decided that the position in Brazil would be filled by a local individual. Plaintiff was advised that LAAM in Miami had to reduce its LTI ranks by one person and his best opportunity would be for him to return to VSSM in Detroit. (Frederick Henderson dep. pp. 19-21, 23) Plaintiff was told he would be placed in a temporary non-LTI assignment, but would retain his LTI designation, and would be considered for an LTI position as openings occurred based on his performance and qualifications. (Archangel memorandum, March 20, 2003) GM maintains that plaintiff was advised that if he was not selected for an LTI position within twelve months, he would return to a non-LTI designation. Plaintiff contends he was assured GM would find a permanent LTI level job for him. (Peterson email, February 17, 2003)

On May 1, 2002, plaintiff was assigned to VSSM in Detroit in the temporary position of General Director - Cadillac Channel Integration. From May 1, 2002 until May 1, 2003, plaintiff received assignments from and reported to Mark LeNeve and Ronald

3

Sobrero. Plaintiff performed below expectations in his projects, which included providing analysis of the SONIC organization and setting up a flagship Cadillac dealership in Phoenix, Arizona. Also, Plaintiff was often away from work and difficult to contact. (Sobrero dep. pp. 40-59; Walsh dep. pp. 38-40, 47-48)

On May 1, 2003, plaintiff was assigned the position of General Director of Channel Integration, reporting to Martin Walsh. Because plaintiff had not obtained an LTI position in the twelve months since his return to VSSM, he was re-leveled non-LTI. However, his base salary of $228,000 per year was not reduced.

On May 2, 2003, the day after being assigned to work for Walsh, plaintiff took an approved disability leave due to extreme back pain that radiated down plaintiff's legs. While on leave, plaintiff consulted with Ronald Taylor, M.D., a physical medicine and rehabilitation specialist, who ordered an MRI. Plaintiff was referred to orthopaedic surgeon Dr. Fischgrund, who recommended surgery in the form of a lumbar laminotomy. A double laminectomy at L4-5 and L5-S1 was performed on plaintiff in May 2003.

Bonus-eligible Executives of General Motors do not participate in any formal short term disability benefit plans. They continue to receive their full base salary with the understanding that they will return as soon as they are able. While on leave, they are expected to keep GM management advised of their prognosis, and to keep in contact with their department through e-mail and telephone. (Howe dep. p. 32) Defendant contends that plaintiff did not keep in touch, and was difficult to reach. Plaintiff returned from his first disability leave on June 16, 2003. At this time, Walsh assigned him the task of integrating the Saturn and Saab dealer networks into the GMs'

4

systems and relocating Saab offices to VSSM offices.  Plaintiff was also asked to take on a bartering project, looking at "paying" for advertising with vehicles.  Mr. Walsh was not satisfied with plaintiff's performance on either project.  (Walsh dep. pp. 40-41, 47-48, 57)  Mr. Walsh was often unable to contact plaintiff during working hours because he had not made anyone aware of his schedule.

Plaintiff's back pain returned, and Dr. Taylor put plaintiff on a regimen of heavy-duty pain medications combined with physical therapy.  Plaintiff went on a second approved disability leave on October 6, 2003.  Dr. Fischgrund performed another double laminectomy on plaintiff.  Plaintiff returned to work on January 5, 2004.

As a result of the dissatisfaction with plaintiff's performance, in early July 2004, plaintiff was placed on a Performance Improvement Plan (PIP).  Plaintiff was assigned to Mr. Powell's group and was to report to Nancy Tuyn.  Powell was plaintiff's previous mentor at GM and had a good relationship with him.  (Powell dep. p. 68)  On July 26, 2004, before this change could take place, plaintiff left on his third approved disability leave due to severe back pain.  Instead of surgery, Dr. Fischgrund recommended a combination of pain medications, physical therapy and epidural steroids.

VSSM Human Resources contacted Dr. Siegel, GM Medical Director, in October 2004, and requested that he monitor plaintiff's leave to determine whether he was unable to report to work.  Dr. Siegel arranged to have plaintiff examined by Dr. Shlomo Mandel, an Independent Medical Consultant, Board Certified Occupational, Internal Medicine and Environmental Medicine.  On October 19, 2004, Dr. Siegel described plaintiff's job duties to Dr. Mandel and requested that Dr. Mandel advise whether plaintiff could return to work:

5

> Mr. Peterson is a director at the General Motors Corporation. His essential job responsibilities require analytical thinking, written and verbal communication skills, computer keyboarding, daily participation in office activities, and meetings with external business associates. Occasional travel, though not essential, may be preferred.

(Defendant's Exhibit M)

Dr. Mandel examined plaintiff on October 26, 2004, and concluded the duties of plaintiff's employment were within his restrictions, i.e., sedentary activities with a sit/stand option, no repetitive bending or twisting and no lifting more than 5-10 pounds repetitively. (Defendant's Exhibit N) On November 2, 2004, GM advised plaintiff that the IME found him capable of returning to work and requested that plaintiff report to Dr. Siegel on November 11, 2004 for a return to work consultation. (Defendant's Exhibit O)

Plaintiff met with Dr. Siegel on November 11, 2004 and reviewed Dr. Mandel's findings. Plaintiff agreed that he could return to work on November 16, 2004. Upon plaintiff's return to VSSM, the PIP was implemented. Plaintiff was presented with a letter from Mr. Powell, which described his past poor performance and concluded by stating, "I hope that you will dedicate yourself to meeting these expectations as outlined above." (Defendant's Exhibit I) Upon his return from disability leave, plaintiff advised GM that he would immediately take his remaining vacation days. Plaintiff thought he had 24 days of vacation, but Kim Howe, HR Manager at VSSM, advised plaintiff that he had 9 vacation days remaining. (Defendant's Exhibit Q)

Nancy Tuyn met with plaintiff on November 16, 2004 and outlined the duties of the position of Global Retail Program Manager and what was expected from plaintiff in that position. Ms. Tuyn made summaries of her subsequent meetings with plaintiff, and there was clear concern about plaintiff's ability to do his job because of his numerous

6

absences. On January 25, 2005, plaintiff advised GM that he was commencing his fourth disability leave.

On February 7, 2005, Dr. Siegel advised plaintiff he needed to talk with plaintiff's treating physicians and receive documentation advising of plaintiff's functional capacity to perform his employment. This phone conversation was taped by plaintiff and transcribed as an exhibit. (Defendant's Exhibit U) Dr. Siegel explained that the information had to have enough detail so that he could form his own opinion as to plaintiff's functional capacity and determine whether he should be at work. On February 11, 2005, plaintiff sent Dr. Siegel physician profiles identifying his two treating doctors, along with a letter giving Dr. Siegel permission to "speak with them regarding the status of my current medical condition." (Plaintiff's Exhibit 22) Dr. Siegel contacted both Drs. Sessa and Fischgrund and got no specific information supportive of a functional assessment of plaintiff. (Siegel dep. p. 51) Plaintiff provided no medical evidence substantiating his disability. On March 1, 2005, plaintiff forwarded to Dr. Siegel a partially completed Supplemental Statement of Claim for Sickness and Accident Benefits, indicating a primary diagnosis of "Myofascitis." (Defendant's Exhibit Y) Myofascitis is defined as inflamation of a muscle and its fascia.

GM retained Data Surveys, Inc. to conduct surveillance on plaintiff. On Friday, March 11, 2005 at 2:15 p.m., a workday at GM, plaintiff and his wife were observed loading several 4' by 8' pieces of plywood, pressed wood and other building materials into plaintiff's company car. On March 18, 2005, a letter was sent to plaintiff terminating his employment because of his failure to provide requested medical documentation supporting his claimed inability to engage in sedentary employment, along with

7

evidence that plaintiff engaged in strenuous physical activities that were inconsistent with his asserted inability to work. (Defendant's Exhibit 2) The decision to discharge plaintiff was approved by senior leadership in VSSM. (Powell dep. pp. 73-75)

Plaintiff contends that on March 23, 2005, Dr. Paul Shapiro, M.D., performed carpal tunnel release surgery on plaintiff's left hand. The surgery was later performed on plaintiff's right hand, providing considerable arm and hand relief. The back problems persisted, and Dr. Fischgrund performed another double laminectomy on plaintiff on April 11, 2005.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The

8

evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## ANALYSIS

I. ERISA § 510

Plaintiff alleges that defendant violated section 510 of ERISA by discharging him from his employment in order to prevent him from receiving pension and health care benefits. 29 U.S.C. § 1140. Recovery under this section depends upon a showing of "a specific intent to interfere with ERISA rights . . . ; no action lies where the alleged loss of

rights is a mere consequence, as opposed to a motivating factor behind the termination." Meredith v. Navistar International Transp. Co., 935 F.2d 124, 127 (7th Cir. 1991) (citation omitted).

To establish his §510 interference claim, plaintiff must present evidence showing that GM "had a specific intent to avoid ERISA liability" when they terminated his employment. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1113 (6th Cir. 2001). Plaintiff can demonstrate "specific intent" through either direct evidence or through a burden-shifting approach similar to that utilized in employment discrimination cases. Smith v. Ameritech, 129 F.3d 857, 865 (6th Cir. 1997). In the absence of direct evidence of discriminatory intent, the plaintiff can state a prima facie case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. Id. Plaintiff must also show "a causal link between pension benefits and the adverse employment decision." Id. Plaintiff must present evidence from which a reasonable jury could find that defendant's desire to avoid pension liability was a determining factor in its prohibited conduct. Id., Mattei v. Mattei, 126 F.3d 794, 808 (6th Cir. 1997) ("the alleged illegal activity [must] have a causal connection to the plaintiff's ability to receive an identifiable benefit.") If a prima facie case is established, the employer can rebut the presumption of impermissible action by presenting evidence of a legitimate, non-discriminatory reason for the challenged action. Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir. 1992).

Plaintiff contends that GM terminated his employment one or two years prior to the time when he would have achieved 30 years of service (Peterson dep. p. 109),

because it would have entitled him to increased pension benefits, along with health care benefits during his retirement. Plaintiff does not have any direct evidence of specific intent, so he must establish an indirect prima facie case of discrimination.

The Sixth Circuit has allowed a plaintiff to make out a prima facie case of ERISA discrimination by showing a close temporal proximity between the employer's action and an important milestone in the vesting of the employee's pension benefits. Petrus v. Lucent Technologies, Inc., 102 Fed. Appx. 969, 971 (6th Cir. 2004) (unpublished decision). In Humphreys, the court held that the plaintiff had made out a "bare minimum" circumstantial prima facie case by showing that his employer discharged him within two months of his pension vesting date. Id. at 1043-44. In another case, the court affirmed a jury verdict for plaintiffs who were discharged four or five years prior to full vesting, where the employer had deliberately compiled a list of "HIGH RISK" employees, and complied a list of employees' pension statuses, before initiating a reduction in force. Pennington v. Western Atlas, 202 F.3d 902, 905 (6th Cir. 2000). As the temporal gap between the employer's action and the attainment of ERISA benefits increases, so will the evidence of intentional discrimination required by the court increase. Petrus, 102 Fed. Appx. at 971. In a case where a transfer occurred two years before a plaintiff's pension would have become fully vested, the Sixth Circuit looked for, but did not find, additional, highly probative facts that suggested intentional discrimination. The court affirmed the district court's finding that plaintiff failed to establish a prima facie case. Id. at 971-72.

In this case plaintiff was terminated one or two years prior to attaining 30 years of service at GM, at which time he would have an enhancement in his ERISA benefits.

11

This is significantly longer than the two month period at issue in Humphreys, so the Court requires additional, highly probative facts, suggestive of intentional discrimination. However, there is no evidence at all that defendant took plaintiff's pension status into account in making its decision to terminate him. Under the law in this circuit, plaintiff has failed to set forth a prima facie case of interfering with his ERISA benefits in violation of § 510.

Defendant's motion for summary judgment of plaintiff's ERISA violation claim is GRANTED.

II. FMLA

Plaintiff alleges that the leave he sought was a FMLA-qualifying leave, and that GM violated the statute by failing to describe plaintiff's rights under the FMLA, and byr failing to return him to the same or equivalent position upon the end of a FMLA leave. To prevail on an entitlement claim, an employee must prove that: (1) he was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003).

Employees are eligible for FMLA leave if they have been employed (1) for at least 12 months, and (2) for at least 1,250 hours of service with such employer during the previous 12-month period. 29 U.S.C. § 2611(2)(A). The FMLA does not define the term "hours of service", however it does say that in making such determination the legal standards established under Section 207 of this Title shall apply. 29 U.S.C. § 2611(2)(C). The regulations explain, "the determining factor is the number of hours an

employee has worked for the employer within the meaning of the FLSA." 29 C.F.R. § 825.110. The FLSA specifies that an employee's "regular rate" of compensation does not include, among other things, (2) payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause. The determination of whether an employee meets the FMLA's eligibility requirements is made in reference to the date the employee commences his or her leave, not the day the employer takes an adverse action against the employee. Butler v. Owens-Brockway Plastic Prods., Inc., 199 F.3d 314, 316 (6th Cir. 1999).

GM claims that in the 12 months preceding the last disability leave, which began January 25, 2002, plaintiff was at work only 904 hours. Plaintiff contends that the 904 hours does not include time he spent working from home, which would be in excess of the 1250 hours required by the FMLA. However, there is no evidence in support of this contention other than plaintiff's own affidavit, stating in a very general manner: "While I was on GM-approved medical leaves of absence due to my back surgeries and continuing back problems, I was in contact with my GM management team about work-related issues and, to the best of my abilities, continued to perform my job duties while convalescing at home." (Peterson Aff. ¶ 11) Plaintiff's affidavit is contradicted by the facts in this case. Plaintiff was on a disability leave from July 26, 2004 until November 16, 2004 and he had no open assignment during that four month period. Plaintiff was

placed under Mr. Powell's supervision in July 2004, but he did not receive any assignments until he returned to work in November of that year.[1]

The Court notes that plaintiff received more than 12 weeks of paid leave with benefits in the year before his termination, when he took disability leave from July 26, 2004 until November 16, 2004. Paid time off logically should count toward the 12 weeks permitted each year by the FMLA, and conversely should not count toward the required 1250 work hours required by the FMLA. Plaintiff contends there is no authority to support this proposition, but acknowledged that it would be consistent with his understanding of the FMLA.

Defendant's motion for summary judgment of plaintiff's FMLA claim is GRANTED.

### III. Elliott-Larsen Civil Rights Act

Plaintiff's claim under the Elliott-Larsen Civil Rights Act is for retaliation. ELCRA prohibits retaliation against any person "because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing . . . ." MCL § 37.2701(a). Plaintiff contends that he pressed GM's HR departments and more senior executives to follow up on the hostile work environment complaints of Julie

---

[1] This fact refutes plaintiff's claim that he was not restored to an equivalent position with the same terms and benefits when he returned from his disability leave in violation of the FMLA. Rather than coming back to a new position and a PIP, plaintiff's assignment was changed and he was put on the PIP prior to commencing his disability leave in July 2004. (Wendy Soubel email to Powell dated July 2, 2004, Defendant's Exhibit L) The new position and PIP could not be implemented until November 2004 because plaintiff was away on leave.

14

Shaeffer and, as a result, was transferred out of LAAM back to VSSM, was demoted, and lost his LTI entitlement.

To establish a prima facie case of retaliation, plaintiff must present evidence that (1) he engaged in protected activity; (2) the employer knew that he engaged in the protected activity; (3) the defendant subsequently took an adverse action against the plaintiff; and (4) the plaintiff's engagement in the protected activity and the adverse action were causally connected. Polk v. Yellow Freight Systems, Inc., 876 F.2d 527, 531 (6th Cir. 1989); Deflaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 436 (1997). Under ELCRA, a higher standard is required in that the protected activity must be a significant factor in the adverse employment decision. Comiskey v. Automotive Indus. Action Group, 40 F.Supp.2d 877, 987 n.21 (E.D. Mich. 1999). A showing of more than a "causal link" is required. Id.

Plaintiff describes speaking about Julie Shaeffer's hostile work environment complaints with Shawn Palegi of HR and Fritz Henderson, at the time an Executive Vice President of GM, in July 2001. According to plaintiff, his intention was "simply one of identifying the potential liability to General Motors, not trying to manage the situation. I want to be clear on that. It was simply something that I became aware of that I thought was a potential problem for General Motors." (Peterson dep. p. 21).

There is no evidence of a causal connection between plaintiff's protected activity and any adverse action taken against plaintiff in this case. Defendant's motion for summary judgment on plaintiff's ELCRA claim is GRANTED.

IV. Disability Discrimination

15

To establish a prima facie case of disability discrimination under the Persons with Disabilities Civil Rights Act ("PWDCRA"), plaintiff must prove (1) that he is disabled within the meaning of the Act; (2) that the alleged disability is unrelated to his ability to perform his job duties; and (3) that he has been discriminated against in one of the ways set forth in the Act. Peden v. Detroit, 470 Mich. 195, 204 (2004). If the plaintiff presents a prima facie case, the burden then shifts to the defendant to articulate a nondiscriminatory reason for the adverse employment action. Rollert v. Civil Service Dept., 228 Mich. App. 534, 538 (1998). If the employer articulates such a reason, the burden shifts back to plaintiff to show that the employer's reasons were a mere pretext. Id.

Plaintiff took his disability leaves from work because he suffered from a back condition. In order to establish that he was disabled within the meaning of the PWDCRA, plaintiff must show that his back condition was unrelated to his ability to perform his job. Hatfield v. St. Mary's Medical Center, 211 Mich. App. 321, 326 (1995); MCL § 37.1102(d)(i)(A). The statute defines the phrase "unrelated to the individual's ability" as meaning "with or without accommodation, an individual's disability does not prevent the individual from . . . performing the particular duties of a job or position." MCL § 37.1103(1).

Plaintiff argues that he should have remained employed by defendant long enough to have a third surgery as an accommodation under the PWDCRA. However, an employer's duty to make "reasonable accommodation" does not require "granting the plaintiff a medical leave until such time as he would be able to perform the requirements of his job." Kerns v. Dura Mechanical Components, Inc., 242 Mich. App. 1, 16 (2000).

Similarly, an employer's duty to accommodate "is limited to the alteration of physical structures to allow access to the place of employment and the modification of peripheral duties to allow job performance. The duty to accommodate imposed under the [PWDCRA] does not extend to new job placement or vocational rehabilitation efforts." March v. Department of Civil Service, 173 Mich. App. 72, 80 (1988).

Plaintiff has failed to establish that he has a disability as defined by the PWDCRA. Defendant's motion for summary judgment on plaintiff's disability discrimination claim is GRANTED.

V. Intentional Infliction of Emotional Distress

Plaintiff does not pursue this cause of action.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is GRANTED.


s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated: January 7, 2008

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on January 7, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk